IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:22-CT-3145-FL

CHRISTOPHER RASHAWN BELFIELD,      )
                                   )
                                   )
              Plaintiff,           )
                                   )                    ORDER
       v.                          )                ~~(UNDER SEAL)~~
                                   )
SGT. GREENWOOD, OFFICER            )
DURHAM, OFFICER CORBETT, and       )
OFFICER VARGAS,                    )
                                   )
              Defendants.          )

 

This matter is before the court on defendants' motions for summary judgment (DE 45) pursuant to Federal Rule of Civil Procedure 56 and to seal materials filed in support thereof (DE 49). Plaintiff responded in opposition to the motion for summary judgment and in this posture the issues raised are ripe for ruling.

## STATEMENT OF THE CASE

Plaintiff, a state inmate proceeding pro se, commenced this action by filing complaint April 26, 2022, asserting claims for violations of his civil rights pursuant to 42 U.S.C. § 1983. Plaintiff alleges defendants assaulted him during an altercation at the Granville Correctional

---

[1] Where this order references certain sealed filings by defendants, defendants are DIRECTED to file under seal, within 14 days, a copy of this order marked to reflect any perceived necessary redactions with the words "Proposed Redacted" affixed to the captioned title. Upon the court's inspection and presuming its approval, a redacted copy of this order, as proposed by defendants in accordance with controlling authority, will be made a part of the public record. If upon its review the court determines a different approach other than what is proposed may be necessary, notice will be given. If the defendants determine no redaction is warranted, they are DIRECTED to file, within that same 14-day period, a notice to that effect. In that event, the clerk will solicit the court's approval to unseal this order before taking additional action.

Institution ("G.C.I."), in violation of the Eighth Amendment to the United States Constitution. Defendants, sued in their individual and official capacities, are sergeant Greenwood ("Greenwood"), officer Durham ("Durham"), officer Corbett ("Corbett"), and officer Vargas ("Vargas"), all of whom were correctional officials at the G.C.I. As relief, plaintiff seeks monetary damages and various forms of injunctive relief.

Following a period of discovery, and in accordance with the case management order, defendants now move for summary judgment. Defendants argue that the use of force was necessary in light of plaintiff's resistance to their efforts to place him on suicide precautions, and that they are entitled to qualified immunity. In support, defendants rely upon memorandum of law, statement of material facts, and appendix of exhibits thereto comprising the following: 1) declaration of Alex Williams, defendants' counsel; 2) plaintiff's offender information from the Department of Adult Correction's ("DAC") public website; 3) plaintiff's disciplinary history; 4) pertinent DAC incident reports; 5) excerpts of plaintiff's medical records; 6) surveillance video; 7) DAC use of force policy; and 8) defendants' personal declarations. As noted, defendants also move to seal all supporting materials filed in support of the motion for summary judgment.

Plaintiff responded in opposition to defendants' motion for summary judgment, relying on response brief, his personal declaration, responsive statement of facts, and appendix of exhibits comprising the following: 1) excerpts of correspondence from plaintiff's discovery counsel; 2) annotated portions of defendants' memorandum of law; 3) DAC policies and procedures related to use of force, self-injurious behavior by inmates, offender classification matters, conditions of confinement, inmate medical services, high security maximum control inmates, and housing unit management; 4) pertinent DAC incident reports; 5) defendants' responses to plaintiff's discovery

2

requests; and 6) excerpts of plaintiff's medical records.

## STATEMENT OF FACTS

Except as otherwise noted below, the court recounts the facts in the light most favorable to plaintiff. On January 26, 2022, plaintiff was housed at the G.C.I. on high-security maximum control ("HCON") status, meaning plaintiff requires the highest amount of supervision and control due to his behavior while incarcerated. (See Incident Report (DE 48-1) at 9, Pl's Offender Info. (DE 48-1) at 3; High Security Maximum Control Policy (DE 56-1) at 94).[2] After receiving unspecified troubling information, plaintiff became suicidal and informed defendant Corbett, a correctional officer at GCI, about his mental state. (Pl's Decl. (DE 55) at 1).[3] Defendant Corbett responded by telling plaintiff he should kill himself. (Id.).

Following the incident with defendant Corbett, a nurse approached plaintiff's cell and plaintiff told her he planned to commit suicide. (Id.). Plaintiff then showed the nurse several pills and ingested all of them in front of her. (Id.; see also Incident Report (DE 48-1) at 9). As a result, correctional officials placed plaintiff in full restraints and escorted him to the nursing station. (Pl's Decl. (DE 55) at 1; Incident Report (DE 48-1) at 9, 11, 15). During this transport, plaintiff was "arguing back and forth" with defendants Corbett and Vargas about his right to see a

---

[2]    Throughout this order, page numbers in citations to documents in the record are to the page number specified in the footer of the document supplied by the court's case management / electronic case filing (CM/ECF) system for the docket entry (DE) and not the page number, if any, showing on the face of the underlying document.

[3]    Plaintiff refers to this document as both a memorandum of law and "declaration pursuant to 28 U.S.C. § 1746," the federal statute permitting declarations under penalty of perjury to support or oppose a motion for summary judgment. (DE 55 at 1, 5). At the conclusion of this filing, plaintiff states that he "declare[s] under penalty that the foregoing is true and correct." (Id. at 5). While plaintiff omitted the key phrase "of perjury" after "penalty," given his status as a pro se litigant and citation to § 1746, the court will accept this filing as a proper opposing declaration. See Erickson v. Pardus, 551 U.S. 89, 94 (2007) (stating filings by pro se litigants should be construed liberally).

3

psychiatrist.   (Pl's Decl. (DE 55) at 3).

Upon arrival in the nursing station, the nurse contacted the on-call physician, who directed that plaintiff be transported to the emergency room.   (See Medical Records (DE 48-1) at 27; Pl's Decl. (DE 55) at 2).   According to plaintiff, he did not refuse any medical treatment or the order to transfer to the emergency room, even though throughout the records medical and correctional staff repeatedly documented that he refused both.   (See Medical Records (DE 48-1) at 26–28; Incident Report (DE 48-1) at 13; Pl's Decl. (DE 55) at 2).   In any event, plaintiff was not transported to the hospital that evening.   (Medical Records (DE 48-1) at 26–28; Pl's Decl. (DE 55) at 2).   Instead, plaintiff was placed on suicide precautions and transported to an "observation" cell.   (Pl's Decl. (DE 55) at 2; Medical Records (DE 48-1) at 28; Greenwood Decl. (DE 48-2) at 2).

The pertinent use of force incident occurred in the observation cell while plaintiff was in full restraints.[4]   (See Pl's Decl. (DE 55) at 2).   Defendants entered plaintiff's cell to remove his clothing and place him in a green smock as part of the suicide watch protocols.   (Incident Report (DE 48-1) at 11; Greenwood Decl. (DE 48-2) at 2; Pl's Decl. (DE 55) at 2; Self-Injurious Behavior Policy (DE 56-1) at 12).   Defendant Durham entered with a "stun shield,"[5] which is an inverted shield large enough to cover most of plaintiff's body, and that can administer electric shocks when activated by the correctional officer.   (Durham Decl. (DE 48-4) at 1–2; Video at 9:56:33–9:56:35).

---

[4]      The surveillance video suggests that one of plaintiff's leg restraints was removed during at least some portions of the incident, but it is not clear enough to reject plaintiff's version.   (See Video at 9:57:50–9:58:12; 10:01:38–10:02:38; 10:11:56–10:12:04 (showing officer possibly reattaching leg restraints)).

[5]      Plaintiff refers to the stun shield as an "electronic shield."   (Pl's Decl. (DE 55) at 2).

4

Plaintiff recounts his version of the incident as follows:

[Defendant] Corbett takes a knife to cut my pants off. [Defendant] Greenwood is standing in front of me, [defendant] Vargas [is] standing behind me, [and] I'm asking [defendant] Greenwood "why are you cutting my clothes off, instead of [giving] me the decency to remove my own clothes." He [defendant Greenwood] told me to shut the [expletive] up.

I feel [defendant] Corbett digging into my leg with [the] knife. You see me look down [and] staff rush me[,] push me back bending my arm[.] [Defendant] Vargas grab[s] my leg and start[s] twisting it, [while] the restraints [are] cutting into my ankles. I'm yelling out "it hurts," [and] "I'm in full restraints[.]" The angle they have me [in] I'm [lying] on my wrists which [are] bent back in cuffs[.] I'm trying to turn to take pressure off my hands, [when defendant] Durham just drop[s] down with [his] whole upper body with [an] electronic shield and press the button and shock me all in the face and head area[.] I felt intense pain [and then I] black[ed] out[.] When I come back I just felt my body getting jerk[ed] around[.] [Defendant] Vargas had my arms pull[ed] out [and he was] ripping at my shirt[.] Defendant Corbett was cutting my pants off hitting me in my legs, [and] officer Durham kept pushing my head back down towards the bunk every time I [tried] to sit up [using] the electronic shield[.] [Defendant] Greenwood at this time was stepping on my leg restraints so my legs couldn't move[.] [After removing plaintiff's clothes, defendants] went to exit [the] cell [while at the same time] making sexual statements like look at [plaintiff's genitals] [and] "oh the [homophobic slur] got a green dress on." I went towards the door with verbal response [while] staff was already outside [the] cell door with [the] shield held up. [Defendant] Vargas reach[ed] around staff and administered pepper spray into my face [before the cell] door was . . . closed. [Defendant] Greenwood return[ed] 30 minutes later and stated, "you tough you don't want to be evaluated or decontaminated." I was refused medical treatment by staff.

(Pl's Decl. (DE 55) at 3–5).

As discussed further below, the video surveillance evidence also is relevant to plaintiff's claims. As shown on the video, defendants enter the cell while plaintiff is sitting on the floor with his hands cuffed behind his back and restraints on his legs. (Video at 9:57:00–9:57:30; Pl's Decl. (DE 55) at 3). Defendant Durham indeed enters with the stun shield, and he initially positions himself in the back of the cell away from plaintiff. (Video at 9:57:15–9:57:56). Over the course of the next nine minutes, defendant Durham does not touch plaintiff with the shield even during

multiple instances in which plaintiff becomes unruly and refuses to allow officers to remove his clothes. (Id. at 9:57:15–10:06:50).

Shortly after entering the cell, remaining defendants assist plaintiff to the bed, place the green smock over his shoulders, and begin the process of removing plaintiff's clothes. (Id. at 9:57:19–10:00:41). During this initial three-minute period, the view of plaintiff is obstructed at times by defendants' positions, and when plaintiff is visible he appears to be sitting on the bed without resisting. (Id.). Next, while defendants are speaking to plaintiff,[6] he begins to slump over towards the bed. (Id. at 10:00:41–10:00:50). Two unidentified defendants then place their hands on plaintiff and attempt to either force him to sit upright or to stand up. (Id. at 10:00:50–10:01:20). At this point, plaintiff is resisting the officers' efforts by moving his body in ways that make it difficult place him in an upright position or to remove his clothing. (See id.; see also Greenwood Decl. (DE 48-2) at 2; Corbett Decl. (DE 48-3) at 2; Durham Decl. (DE 48-4) at 1; Vargas Decl. (DE 48-5) at 1).

Defendants successfully place plaintiff in an upright seated position on the bed, and resume efforts to remove his clothing. (See Video at 10:01:20–10:01:38; Pl's Decl. (DE 55) at 3). Plaintiff continues to resist defendants' efforts by moving on the bed while the officers attempt to gain control. (See id. at 10:01:20–10:01:38). During this period, one of the defendants stands on plaintiff's leg restraints while plaintiff continues to resist. (See id. at 10:01:38–10:02:25). Beginning at time stamp 10:01:38[7] and continuing for the next several minutes, plaintiff is either obscured from view or does not appear to be resisting the officers while they continue to cut off

---

[6] The video does not have sound.

[7] This timestamp may not reflect the correct time of day the incident occurred. (See Pl's App. (DE 56-1) at 1). The court uses the timestamp solely for purposes of identifying the pertinent section of the video.

6

his clothes.   (Id. at 10:01:38–10:05:48).

At the 10:05:39 timestamp, plaintiff turns his head around and begins talking to one of the defendants positioned behind him.   (Id. at 10:05:39–10:05:46).   Plaintiff then suddenly stands up and moves his face in the direction of the officer behind him.   (Id. at 10:05:46–10:05:49). Defendants quickly place plaintiff back down on the bed where he remains in a seated position. (See id. 10:05:48–10:05:51).   Despite the fact that several defendants are holding plaintiff down, he again suddenly lunges up from the bed and moves his head in the direction of the officer behind him.   (Id. at 10:05:51–10:05:54).   Defendants again place plaintiff back down on the bed in a seated position.   (Id. at 10:05:54–10:05:55).   Notably, during both of these incidents, defendants use minimal force to place plaintiff back on the bed in a seated position.   (See id. at 10:05:46–10:05:56).

Next, plaintiff lunges at the officer a third time while again shoving his head towards him and making what appears to be a spitting gesture.   (See id. at 10:05:57–10:05:58; see also Vargas Decl. (DE 48-5) (noting plaintiff was attempting to spit on staff)).   At this point, defendants push plaintiff face first onto the bed and attempt to restrain him and remove his clothing.   (Video 10:05:58–10:06:19).   But plaintiff continues to resist these efforts even after he was pushed onto the bed.   (Id.).   At the 10:16:20 timestamp, the view of plaintiff's upper body and most of his legs becomes obstructed by the officers, and it remains so for approximately one minute and 40 seconds.   (Id. at 10:06:20–10:08:00).

During this time, defendant Durham walks from the back of the cell toward plaintiff's bed. (Id. at 10:06:50–10:06:53).   Approximately 25 seconds later, defendant Durham places the shield near plaintiff's head as can be seen through the window of the cell door.   (Id. at 10:07:20).   It is

7

not possible to determine from the video alone whether defendant Durham administers an electric shock over the next approximately two minutes. (See Video at 10:07:20–10:09:46). Notably, plaintiff begins resisting the officers' efforts to subdue him at approximately the 10:08:37 time stamp. (Id. at 10:08:37).

At the 10:09:41 timestamp, plaintiff is mostly obstructed from view, but it does not appear that he is actively resisting at this point. (Id. at 10:09:41). Then, at the 10:09:47 timestamp, defendant Durham shifts his hands on the shield and the shield recoils back while defendant Vargas looks up at him. (Id. at 10:09:46–10:09:48). Although far from clear from the video evidence alone, it is possible that plaintiff was shocked with the shield at this point. (See id.; Pl's Decl. (DE 55) at 3–4). And for the next few minutes, plaintiff arguably does not resist defendants' efforts to remove his clothes, suggesting he may have been unconscious at the time. (Video at 10:09:48–10:12:10; Pl's Decl. (DE 55) at 4).

For the remainder of the time inside plaintiff's cell, defendant Durham stands beside the bed with the shield held over plaintiff while the remaining defendants remove plaintiff's clothes. (Video at 10:12:10–10:19:00). Defendant Vargas exits the cell at approximately 10:15:29. (Id. at 10:15:29). At the 10:19:00 timestamp, the remaining defendants in the cell gather behind defendant Durham, who lifts the shield and begins to back away toward the open cell door. (Video at 10:19:00–10:19:02). During this same two-second window, plaintiff stands up close to the shield and moves aggressively toward the shield/cell door while yelling at defendants as they are retreating. (Id. at 10:19:01–10:19:03). In response, defendant Vargas reaches over the other officers and around the shield, and dispenses pepper spray for approximately one second in plaintiff's direction. (Id. at 10:19:04–10:19:05). Plaintiff briefly recoils backwards after he is

8

hit with the pepper spray but he then charges back toward the door, which remains open but blocked by the shield. (Id. at 10:19:05–10:19:13). Defendants manage to prevent plaintiff from leaving his cell by blocking the door with the shield until the door automatically closes. (Id. at 10:19:05–10:19:17).

## DISCUSSION

A.      Motion for Summary Judgment

1.      Standard of Review

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the non-moving party must then "come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986).[8]

Only disputes between the parties over facts that might affect the outcome of the case properly preclude entry of summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986) (holding that a factual dispute is "material" only if it might affect the outcome of the suit and "genuine" only if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party). "[A]t the summary judgment stage the [court's] function is not [itself] to weigh the evidence and determine the truth of the matter but to determine whether there is a

---

[8]      Throughout this order, internal citations and quotation marks are omitted from citations unless otherwise specified.

9

genuine issue for trial." Id. at 249. In determining whether there is a genuine issue for trial, "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [non-movant's] favor." Id. at 255; see United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) ("On summary judgment the inferences to be drawn from the underlying facts contained in [affidavits, attached exhibits, and depositions] must be viewed in the light most favorable to the party opposing the motion.").

Nevertheless, "permissible inferences must still be within the range of reasonable probability, . . . and it is the duty of the court to withdraw the case from the [factfinder] when the necessary inference is so tenuous that it rests merely upon speculation and conjecture." Lovelace v. Sherwin–Williams Co., 681 F.2d 230, 241 (4th Cir. 1982). Thus, judgment as a matter of law is warranted where "the verdict in favor of the non-moving party would necessarily be based on speculation and conjecture." Myrick v. Prime Ins. Syndicate, Inc., 395 F.3d 485, 489 (4th Cir. 2005). By contrast, when "the evidence as a whole is susceptible of more than one reasonable inference, a [triable] issue is created," and judgment as a matter of law should be denied. Id. at 489–90.

2.    Analysis

Defendants raise the affirmative defense of qualified immunity. The qualified immunity analysis proceeds in two steps, which the court "may address in whichever sequence will best facilitate the fair and efficient disposition of the case." Pfaller v. Amonette, 55 F.4th 436, 444 (4th Cir. 2022). First, the plaintiff must show a violation of a constitutional right. Id.; Stanton v. Elliot, 25 F.4th 227, 233 (4th Cir. 2022). Second, defendants bear the burden of showing the right at issue was not "clearly established" at the time of the alleged misconduct. Pearson v.

10

<u>Callahan</u>, 555 U.S. 223, 231 (2009); <u>Stanton</u>, 25 F.4th at 233.

The court begins with the first prong. The Eighth Amendment prohibits the "unnecessary and wanton infliction of pain" which constitutes cruel and unusual punishment. <u>Whitley v. Albers</u>, 475 U.S. 312, 319 (1986). The excessive force inquiry has an objective prong and a subjective prong. Under the objective prong, the inmate must establish that the force used was "nontrivial" or more than "de minimis." <u>Wilkins v. Gaddy</u>, 559 U.S. 34, 39 (2010) (per curiam); <u>Hudson v. McMillian</u>, 503 U.S. 1, 10 (1992).

To satisfy the subjective prong, the inmate must show a prison official acted with a "sufficiently culpable state of mind." <u>Wilson v. Seiter</u>, 501 U.S. 294, 297 (1991). In an excessive force case, "the state of mind required is wantonness in the infliction of pain." <u>Brooks v. Johnson</u>, 924 F.3d 104, 112 (4th Cir. 2019). The relevant inquiry for the subjective prong is whether the force was applied "in a good faith effort to maintain or restore discipline," or "maliciously" and "for the very purpose of causing harm." <u>Whitley</u>, 475 U.S. at 320–21; <u>Brooks</u>, 924 F.3d at 113. The "question is not whether a reasonable officer <u>could</u> have used force to maintain discipline, but whether these particular officers <u>did</u> use force for that reason." <u>Brooks</u>, 924 F.3d at 113. "Corrections officers act in a good faith effort to maintain or restore discipline – that is, with a permissible motive – not only when they confront immediate risks to physical safety, but also when they attempt to preserve internal order by compelling compliance with prison rules and procedures." <u>Id.</u>; <u>see also</u> <u>Dean v. Jones</u>, 984 F.3d 295, 302 (4th Cir. 2021). "But corrections officers cross the line into an impermissible motive – using force maliciously and for the very purpose of causing harm – when they inflict pain not to induce compliance, but to punish an inmate for intransigence or to retaliate for insubordination." <u>Brooks</u>, 924 F.3d at 113; <u>Williams</u>

11

v. Benjamin, 77 F.3d 756, 765 (4th Cir. 1996).

At the summary judgment stage, "the inquiry under the subjective prong boils down to whether a reasonable jury could determine that an officer acted with malice, applying force punitively and for the very purpose of causing harm." Dean, 984 F.3d at 302. The officers' subjective motive may be proved through direct or circumstantial evidence. Id. at 308–09; Brooks, 924 F.3d at 114–16. With respect to circumstantial evidence, the court considers four factors "from which . . . inferences may be drawn as to the officers' motives." Brooks, 924 F.3d at 116. These factors are: "(1) the need for the application of force; (2) the relationship between the need and the amount of force that was used; (3) the extent of any reasonably perceived threat that the application of force was intended to quell; and (4) any efforts made to temper the severity of a forceful response." Whitley, 475 U.S. at 321 (hereinafter, the "Whitley factors"); Dean, 984 F.3d at 302. In the instant procedural posture, the court generally must apply these factors while viewing the facts in the light most favorable to the plaintiff. See Dean, 984 F.3d at 301–07.

However, where the record includes "facts . . . depicted by . . . videotape," the court is guided by the Supreme Court's direction that "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, [inclusive of video footage,] so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Scott v. Harris, 550 U.S. 372, 381 (2007); Iko v. Shreve, 535 F.3d 225, 230 (4th Cir. 2008) ("[W]here, as here, the record contains an unchallenged videotape capturing the events in question, we must only credit the plaintiff's version of the facts to the extent it is not contradicted by the videotape."). But "[s]ummary judgment is proper under Scott only when there is evidence – like the videotape in Scott itself – of undisputed authenticity

12

that shows some material element of the plaintiff's account to be blatantly and demonstrably false." Harris v. Pittman, 927 F.3d 266, 276 (4th Cir. 2019).

Here, plaintiff asserts defendants used excessive force as follows: 1) "digging into [plaintiff's] leg with a knife" while attempting to remove his clothes (only as to defendant Corbett); 2) twisting plaintiff's legs and pushing plaintiff onto the mattress while he is in full restraints, causing the restraints to cut into his ankles and injure his wrists; 3) by using the "stun shield" to electrically shock plaintiff (defendant Durham); 4) using the shield to push plaintiff's head down onto the bed each time he tried to sit up (defendant Durham); 5) stepping on plaintiff's leg restraints to prevent leg movements; and 6) deploying pepper spray.   (Pl's Decl. (DE 55) at 3–5).

Beginning with the objective prong of the Eighth Amendment analysis, and drawing all reasonable inferences in plaintiff's favor, his affidavit establishes a genuine dispute of fact as to whether these separate deployments of force were nontrivial or more than de minimis.   See Wilkins, 559 U.S. at 39.   The United States Court of Appeals for the Fourth Circuit has held that similar uses of force satisfy the objective component.   See Alexander v. Connor, 105 F.4th 174, 177, 182 (4th Cir. 2024) (stating that plaintiff established triable issue of fact on objective prong where he asserted defendants, among other things, violently jerked his hand against restraints, causing a wrist sprain); Dean, 984 F.3d at 303 (concluding "sustained blast of pepper spray to the face constitutes something more than de minimis force"); Brooks, 924 F.3d at 112 (use of taser, which is similar to "stun shield," satisfied objective component).   And to the extent the court of appeals has not addressed the precise deployments of force identified above, the court finds a reasonable jury could conclude that digging into plaintiff's leg with a knife, standing on leg restraints to prevent movement while other officers assault plaintiff, and forcing plaintiff's head

13

down with a stun shield are more than nontrivial or de minimis uses of force.   Wilkins, 559 U.S. at 39.   Finally, and contrary to defendants' argument, the lack of injury associated with most of these actions is not dispositive of the objective component.   See Dean, 948 F.3d at 303.

The court therefore proceeds to the subjective prong.   As noted above, defendants are not liable under the Eighth Amendment when they act "in a good faith effort to maintain or restore discipline . . . not only when they confront immediate risks to physical safety, but also when they attempt to preserve internal order by compelling compliance with prison rules and procedures." Brooks, 924 F.3d at 113.   Relying on this principle, defendants argue that under Scott v. Harris the video evidence establishes as a matter of law that any use of force was justified in light of plaintiff's refusal to cooperate with defendants' directives to remove his clothing.[9]   See 550 U.S. at 381.

The problem with this argument is that Scott is a narrow exception to the rule that the court must adopt plaintiff's version of the facts.   See Alexander, 105 F.4th at 179; Harris, 927 F.3d at 276.   The video evidence must show "that some material element of the plaintiff's account [is] blatantly and demonstrably false."   Alexander, 105 F.4th at 179.   And where, as here, the view of plaintiff is obstructed by officers or the video may be construed at times consistently with plaintiff's account, the court cannot rely on other portions of the video to weigh plaintiff's credibility or otherwise adopt the officers' version of events.   Id. at 178–80 (explaining district court should adopt plaintiff's version of events when he is out of view of the camera, and that plaintiff's version must be adopted even if the videotape casts serious doubt on same); Simmons

---

[9]      Plaintiff does not dispute that he was required to remove his clothes upon placement on suicide precautions. (See Greenwood Decl. (DE 48-2) at 2; Corbett Decl. (DE 48-3) at 1–2; Self-Injurious Behavior Policy (DE 56-1) at 12).

14

v. Whitaker, 106 F.4th 379, 385–86 (4th Cir. 2024) ("Under Scott and our circuit precedent . . . even an unchallenged video must be taken in the light most favorable to Simmons at summary judgment if it does not blatantly contradict his account of the facts.").

Here, there are multiple segments of the video that show plaintiff is either not resisting while subdued and in full restraints, or where he is obstructed from camera view. (See Video at 9:57:19–9:58:12; 10:01:38–10:05:48; 10:06:20–10:08:30, 10:09:41–10:12:10). During these portions of the video, it is possible that defendants acted as plaintiff alleges by digging a knife into plaintiff's leg, twisting his arms or legs in a manner that caused unnecessary pain, shocking plaintiff with the shield, pushing plaintiff's head down with the shield, or stepping on his leg restraints in a manner causing injury, all while plaintiff was restrained and not actively resisting the officers. (See id.; see also Pl's Decl. (DE 55) at 3–5).

It is true that, at times, plaintiff resisted defendants' attempts to remove his clothing and on at least three occasions he lunged toward one of the defendants while possibly attempting to spit on him. (See generally Video). But the "justification for using protective force expires at the very moment a threat is neutralized." Dean, 984 F.3d at 305. Although far from a model of clarity, plaintiff's declaration can be read to suggest he was not resisting prior to the use of force incidents noted above. (See Pl's Decl. (DE 55) at 3–5). And for the reasons explained above, the video does not blatantly contradict plaintiff's account. As a result, the court cannot use the other incidents shown in the video to discount plaintiff's account. See Alexander, 105 F.4th at 178–80.

Having determined the relevant facts solely for purposes of summary judgment, and drawing all reasonable inferences in plaintiff's favor, he has established a triable issue of fact on

15

the subjective prong as to each use of force incident identified above, excluding the use of pepper spray. Starting first with the <u>Whitley</u> factors, and assuming that plaintiff was restrained and not resisting the officers in the moments prior to these use of force incidents, a reasonable jury could find that there was no need for the application of force, that as a result the force was disproportionate to the need, that there were no immediate threats to officer safety, and that defendants failed to make efforts to temper the severity of the force. <u>See</u> <u>Dean</u>, 984 F.3d at 304 (concluding <u>Whitely</u> factors weighed in plaintiff's favor where under the plaintiff's version he was "fully subdued and non-resistant" in the seconds leading up to the use of force).

Plaintiff also offers defendants' statements to show triable issue of fact on the subjective prong. <u>See</u> <u>id.</u> at 309 (holding that direct statements reflecting malicious intent should be considered when evaluating the subjective prong of an Eighth Amendment excessive force claim). In his sworn declaration, plaintiff states that defendant Corbett told plaintiff to kill himself after plaintiff informed him that he was having thoughts of suicide. (Pl's Decl. (DE 55) at 2). In addition, defendants reportedly used a homophobic slur and belittled plaintiff's appearance as they were leaving the cell. (<u>Id.</u> at 4). These statements, which can be presented at trial in the form of admissible evidence,[10] are circumstantial evidence that defendants harbored malicious intent at the time of the pertinent incidents, and further bolster the court's conclusion that plaintiff has established genuine dispute of material fact on the subjective prong. <u>See</u> <u>Dean</u>, 984 F.3d at 308–09.

The court reaches a different conclusion, however, as to that part of plaintiff's claim based upon defendant Vargas's use of pepper spray. As recounted in detail above, the video shows that

---

[10] <u>See</u> Fed. R. Evid. 801(d)(2)(A) (excluding from hearsay rule statements "offered against an opposing party" that were "made by the party in an individual . . . capacity").

16

plaintiff rushed toward defendants as they were attempting to leave the cell. (Video at 10:19:00–10:19:05). In response, defendant Vargas reaches over the other defendants and dispenses a burst of pepper spray lasting approximately one second. (Id.).

No reasonable jury could conclude that this use of force was excessive. As to the Whitley factors, there was a clear need for use of force given that plaintiff was approaching the officers in an aggressive manner while the cell door remained open, and especially in light of his prior attempts to attack the officers while in the cell. (Id. at 10:05:39–10:05:58; 10:19:00–10:19:05). Defendant Vargas also did not use disproportionate force given the threat plaintiff posed and the brief burst of pepper spray that was necessary to subdue plaintiff and give the remaining defendants time to close the door. (See id. at 10:19:00–10:19:05). And while defendant Vargas did not attempt to temper the severity of the force, there was no time to do so given plaintiff's presentation and the fact that he could have escaped by pushing the remaining officers out of the cell. Accordingly, the Whitley factors weigh heavily against finding an improper motive here. See Williams v. Benjamin, 77 F.3d 756, 763 (4th Cir. 1996) (concluding "initial application of mace" in similar circumstances did not violate the Eighth Amendment and noting "mace can be constitutionally used in small quantities . . . to control a recalcitrant inmate").

As noted above, plaintiff also relies on defendants' statements suggesting malicious intent to cause harm. Defendant Vargas, however, did not tell plaintiff to kill himself prior to the use of force incident. (See Pl's Decl. (DE 55) at 2). Moreover, plaintiff attests that the officers exiting the cell behind the shield made the sexualized and belittling comments, but defendant Vargas was not part of this group. (Video at 10:08:15–10:19:04; Pl's Decl. (DE 55) at 4). Accordingly, these statements do not change the analysis as to the pepper spray incident.

17

In sum, plaintiff establishes a triable issue of fact as to the following claims: 1) defendant Corbett digging the knife into plaintiff's leg, 2) defendant Durham using the stun shield to shock plaintiff and push his head down, and 3) the remaining defendants twisting plaintiff's legs while he is full restraints, pushing him to the bed in a manner that injured his wrists, and stepping on the leg restraints. As demonstrated on the video, defendant Vargas did not use excessive force when he deployed the pepper spray. Defendants are entitled to judgment as a matter of law as to that part of plaintiff's claim based upon deployment of pepper spray.

As to the remaining claims, the court proceeds to the second prong of the qualified immunity analysis. See Pearson, 555 U.S. at 231. Here, the question is whether "an objectively reasonable officer could have believed that his actions were lawful in light of clearly established law." Dean, 984 F.3d at 311. Typically, this requires identifying binding precedent in analogous factual circumstances that places the constitutional violation beyond debate. See Kisela v. Hughes, 584 U.S. 100, 104 (2018). Defining the constitutional right at issue "must be undertaken in light of the specific context of the case, not as a broad general proposition." Brosseau v. Haugen, 543 U.S. 194, 198 (2004).

The Fourth Circuit, however, has held that the first and second inquiries effectively collapse in the context here, where the Eighth Amendment inquiry depends on whether the officers inflicted pain maliciously and with intent to cause harm. See Dean, 984 F.3d at 310. This is because "it was clearly established in 2015 – and for many years before that – that inmates have a right to be free from pain inflicted maliciously and in order to cause harm, rather than as a good faith-effort to protect officer safety or prison order." Id. Thus, assuming the officers "acted with a wrongful and punitive motive, then they violated clearly established Eighth Amendment law."

18

Id.

Because Dean is binding precedent, the court must deny qualified immunity in this procedural posture notwithstanding defendants' conclusory argument that no analogous case indicates defendants violated clearly established law. (See Defs' Mem. (DE 46) at 13). Accordingly, the claims identified above will proceed to trial.

3. Official Capacity Claims

Plaintiff also asserts claims against defendants in their official capacities. (See Compl. (DE 1) at 3–4). "Official-capacity suits . . . generally represent only another way of pleading an action against an entity of which an officer is an agent." See Kentucky v. Graham, 473 U.S. 159, 165–66 (1985). And in the context here, neither States, state agencies, nor state officials acting in their official capacities are "persons" subject to suit under § 1983. Will v. Michigan Dep't of State Police, 491 U.S. 58, 71 (1989). Moreover, these claims are barred by the Eleventh Amendment. See Board of Trustees of Univ. of Ala. v. Garrett, 531 U.S. 356, 363 (2001); Idaho v. Coeur d'Alene Tribe of Idaho, 521 U.S. 261, 267 (1997).[11] Although defendants do not address these claims in the instant motion for summary judgment, the court nevertheless dismisses them pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii), which permits sua sponte dismissal in this context.

C. Motion to Seal

Defendants move to seal their summary judgment submissions, including the memorandum of law, statement of material facts, and appendix. The court declines to seal these filings in their entirety where substantial portions of the materials sought to be sealed do not

---

[11] The exceptions to Eleventh Amendment immunity are not applicable here. See College Savs. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd., 527 U.S. 666, 670 (1999); Fitzpatrick v. Bitzer, 427 U.S. 445, 456 (1976); Ex parte Young, 209 U.S. 123, 159 (1908).

19

include confidential or sensitive information.  Less drastic alternatives are available in form of redacting these filings or sealing of specific exhibits.  <u>Doe v. Public Citizen</u>, 749 F.3d 246, 266–67, 272 (4th Cir. 2014).  Accordingly, the motion to seal is denied without prejudice to submitting redacted versions of these filings, or filing renewed motion to seal as to specified exhibits, on the schedule set forth below.[12]

## CONCLUSION

Based on the foregoing, defendants' motion for summary judgment (DE 45) is GRANTED IN PART and DENIED IN PART.  The motion is granted as to the excessive force claim premised on defendant Vargas's use of pepper spray, and denied as to all remaining excessive force claims against defendants in their individual capacities.  The court also DISMISSES plaintiff's official capacity claims pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii).

Defendants' motion to seal (DE 49) is DENIED.  Contemporaneous with the proposed redactions to this order (<u>see</u> <u>supra</u> n.1), moving defendants shall file proposed redactions to the memorandum of law and statement of material facts, together with any motion to seal specific exhibits in their appendix.

Before entering a trial scheduling order, the court requires that the parties participate in a settlement conference.  Accordingly, pursuant to Local Alternative Dispute Rule 101.1, EDNC, this case is REFERRED to United States Magistrate Judge Robert T. Numbers, II, for a court-hosted settlement conference, for the purpose of resolving all remaining issues in dispute.  The magistrate judge will notify the parties how he wishes to proceed.  North Carolina Prisoner Legal Services is APPOINTED to represent plaintiff for the settlement conference pursuant to Standing

---

[12]     Although the motion to seal is denied, the filings will remain under seal and unavailable to the public.  The redacted copies will be the only versions on the public docket.  <u>See</u> Local Civil Rule 79.2(b).

Order 21-SO-11.  In the event the parties do not reach a resolution of this action, further order regarding trial planning and scheduling will follow.

SO ORDERED, this the 26th day of March, 2025.

_____
LOUISE W. FLANAGAN
United States District Judge